IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| **GUARDSMARK (PUERTO RICO), LLC,** | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:08--2317 |
| **MIRAMAR REAL ESTATE MANAGEMENT, INC,** | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Guardsmark (Puerto Rico), LLC ("Guardsmark") brings state law contractual claims against Defendant Miramar Real Estate Management, Inc. ("Miramar"). The Court conducted a non-jury trial of this matter on November 3, 2009. The parties being diverse and the amount in controversy being more than $75,000, jurisdiction is proper pursuant to 28 U.S.C. § 1332. After considering all the evidence, including the testimony of the witnesses, the exhibits, and the briefs of the parties, the Court makes the following findings of fact and conclusions of law.

**I.    Findings of Fact**

   **a.  Background**

At the time of trial, Plaintiff was a company located in Puerto Rico and a wholly owned subsidiary of Guardsmark, LLC, a Delaware limited liability company whose principal office is located in Memphis, Tennessee. (Pl.'s Compl. ¶ 1, Order Denying Mot. to Dismiss at 2.) Guardsmark provides security services, servicing fourteen clients in Puerto Rico and employing

close to 500 security officers.  (Trial Transcript, hereinafter "Tr." 92.)  Miramar is a company engaged in real estate sales and management, incorporated and having its principal place of business in Puerto Rico.  (Def.'s Resp. in Opposition to Mot. for Summ. J.; Ex D. at ¶2.)  In March of 2008, Miramar stopped sending payments to Guardsmark security services.   In total, 140 invoices were unpaid.[1]  (Ex. 2, Tr. 24.)  Guardsmark sent a demand letter to Miramar on March 21, 2008. (See Compl., Ex. C.)  On April 1, 2008, Guardsmark filed suit in Chancery Court for Shelby County (Tennessee) seeking damages for breach of contract, prejudgment interest, costs, and attorneys' fees.[2]  Miramar removed the case to this Court.  (See Notice of Removal.)

### b.  Business Relationship and Invoices

Miriam Franceschi, a manager for Guardsmark in Puerto Rico[3], (Tr. 91) personally opened the Puerto Rico branch of Guardsmark in 2001 and was responsible for developing its clientele.  (Tr. 92.)  Ms. Franceschi presented the initial proposal to Miramar offering Guardsmark's services, including Carlos Lopez de Azua, President of Miramar. (Tr. 143.)  While a written service contract was not entered into by the parties, Guardsmark and Miramar commenced a long-term agreement in which Guardsmark provided Miramar with security services in Puerto Rico for fourteen months, from approximately January 31, 2007 to March 24, 2008. (Statement of Uncontested Facts, Joint Pre-trial Order at 9; Tr. 22, 93.)  Miramar received two service orders outlining initial terms and salary rates from Guardsmark during the first two weeks of negotiations (Ex. 13, 14), which Miramar never signed or returned.  (Tr. 184.) Miramar did not receive any other service orders.  (Tr. 185.)

---

[1] During the trial, Miramar continually objected to the entry of Guardsmark's invoices into the record as exhibits. (Tr. 33.)  The Court finds that these invoices are relevant and accurate copies of the invoices submitted to Miramar, and therefore overrules this objection.
[2] Guardsmark provided security service to Miramar for a short period after Guardsmark filed suit.  (Tr. 74.)
[3] Ms. Franceschi had extensive law enforcement experience prior to her employment with Guardsmark.  (Tr. 91.)

Guardsmark billed Miramar for these services by sending weekly invoices mailed to the attention of Emil Hernandez, Miramar's Director of Security. (Statement of Uncontested Facts, Joint Pre-trial Order at 9; Tr. 23-24.) During the fourteen month time period in which Guardsmark provided services to Miramar, Guardsmark sent over three hundred invoices to Defendant. (Id. at 10; Ex. 2.) Over the course of the parties' agreement, Miramar remitted payment by signed check for over one hundred Guardsmark invoices. (Id.) Guardsmark's invoices contained language at the bottom of the front page as follows: "Guardsmark services, without written agreement, are subject to the terms and conditions appearing on the front and back of this invoice." (Id.)

The referenced language is contained in Paragraph 16 of the Standard Terms and Conditions on the back of the invoices and reads as follows:

> "INVOICING AND PAYMENTS: GUARDSMARK will invoice the Client weekly. Invoices will be mailed to such office as Client may, from time to time, direct, and are payable by Client upon receipt at the address specified on the invoice. Amounts invoiced for services rendered shall not be subject to offset or any withholding by Client. No payment of a lesser amount than is then due and payable shall be deemed to be other than on account of the earliest dated invoices, nor shall any endorsement or statement accompany any check or other form of remittance by Client deemed an accord and satisfaction without GUARDSMARK's express written consent and GUARDSMARK or GUARDSMARK's agent may accept such checks or other forms of remittance without prejudice to GUARDSMARK's right to recover the balance of such invoice amounts or to pursue any other remedy provided by law or equity. Client agrees to pay reasonable attorney's fees and other costs which may be incurred to collect any unpaid amounts due under this Agreement. All amounts not promptly paid by Client shall be subject to a late charge of 2% per month or such lesser amount as maybe allowed under applicable law."

(Ex. 3.)

Paragraph 21 of the Standard Terms and Conditions on the back of the invoices reads:

> "LIMITATIONS ON ACTIONS AND VENUE: Client shall give GUARDSMARK written notice (giving all relevant information) within 20 days of any claim, potential claim or occurrence which may give rise to a claim arising out of or relating to this Agreement. No legal action or proceeding relating to or arising out of this Agreement

3

shall be brought by Client against GUARDSMARK unless (i) written notice as aforesaid was given to GUARDSMARK and (ii) such legal action or proceeding is brought within one year of the date the cause of action arose. Each party hereby consents to the personal jurisdiction and venue of the U.S. District Court for the Western District of Tennessee and any court of the State of Tennessee for the conduct of any action, suit or proceeding of whatsoever kind or nature arising out of or relating to this Agreement or the services provided hereunder."

(Ex. 3.)

Per the invoices, Guardsmark charged two standard rates— $16.33 per hour for supervisors and $14.00 per hour for security guards— in addition to standard hourly rates for overtime and holidays. These rates were set forth on the front of each invoice by hourly rate and number of hours worked. (See Ex. 2, 10, 15, 21.) Based on the evidence in the record, the Court finds that these rates remained unchanged during the parties' course of dealing. (See Ex. 2; Tr. 24.) On several occasions during the parties' course of dealing, Miramar disputed invoices, specifically overtime and holiday hours billed. (Ex. 9; Tr. 111, 163, 165, 167.) Miramar alleged that on several occasions security guards were not trained, were found sleeping while on duty, and did not report for work. (Ex. 7. 8, 19, 20; Tr. 251.) As billing disputes continued, Miramar requested that Guardsmark provide additional supporting documentation with its invoices. (Tr. 161-162, 164, 171, 175-76.) Guardsmark's local staff handled these disputes and where appropriate, invoices were resubmitted to Miramar. (Tr. 59.)

      c. **Invoicing Procedure and Disputes**

Miramar maintained throughout trial that they never received the backs on the invoices which stated the contractual terms of the agreement— namely, jurisdiction, late fees, and attorney's fees —and therefore, Miramar did not consent to those terms. (Tr. 177, 193, 195, 273.) Mr. Lopez testified that the first time he saw the back of an invoice was during the course of litigation. (Tr. 188.) However, notice of Guardsmark's terms and conditions were provided

on the front of the invoices, and Mr. Lopez admitted that he had read the notices. (Tr. 233.) Miramar contends that invoices were dropped off at Miramar's headquarters, not received via U.S. mail. (Tr. 187.) Mr. Lopez testified that he observed Guardsmark employees dropping off envelopes at Miramar's offices. (Tr. 209.) He testified that Miramar received invoices in both original form and some as copies. (Tr. 187.) He identified "originals" as printed on different paper from invoices they identified as copies. (Tr. 188.)

Richard Luse ("Luse"), a vice-president at Guardsmark, described the billing process used to bill its clients, including Miramar.[4] Each invoice is produced as an individual document, and a record is made when a payment is received. An account is retrieved from the computer database by its number. This record shows each invoice, the invoice date, the amount of invoices unpaid and the balance due on the account. (Tr. 21-27.) The invoices are printed onto forms by Commercial Data Corporation, which then delivers the invoices to Guardsmark by courier. (Tr. 47.) The invoices are then sorted by a billing clerk who is assigned to a geographical area that Guardsmark services. (Id.) A clerk places the invoices in envelopes which are sent to the mailroom to be mailed via U.S. Mail to specific clients. (Tr. 47-48.) Mr. Luse did not have personal knowledge as to how Miramar received invoices, knowledge of the services rendered by Guardsmark Puerto Rico, LLC, or knowledge regarding the individual billing disputes that occured in Puerto Rico. (Tr. 58, 61, 66-68.) Guardsmark also provided a record of their account history with Miramar, (Ex. 1; Tr. 29-30) calculating the amount of late charges due as $160, 350.19. (Tr. 46.)

Arthur Essary, a programmer analyst for Commercial Data Corporation, testified that he personally processed all the invoices Guardsmark sent to Miramar. (Tr. 79-87.) He described in

---

[4] Mr. Luse's duties included managing collections, and the collection efforts for the Miramar account took place in Memphis. (Tr. 71.)

detail his use of pre-printed forms provided by Guardsmark. (Tr. 81.) The invoice number, the amount of the invoice including the rates and hours, client number, and remittance address were printed onto the pre-printed forms provided by Guardsmark. (Tr. 82-83.) He printed two copies of each invoice on a weekly basis. (Tr. 84.) Mr. Essary testified that he had never seen or processed an invoice that did not include terms and conditions on the back. (Tr. 86-87.) After printing the invoices, they were returned to Guardsmark. (Tr. 87-88.)

Based on the substantial record of Guardsmark's invoicing procedures, particularly the testimony of Mr. Essary, the Court finds that Miramar did receive invoices with terms and conditions on the back. Assuming arguendo that Miramar did not receive invoices with terms and conditions on the back, they had—at the very least, sufficient notice of the terms and conditions found on the back of Guardsmark's invoices because of the language listed on the front of the invoice. Miramar has not provided sufficient evidence to support the allegations that Guardsmark deviated from its normal, routine billing processes.

### d. Billing Disputes

Mr. Lopez, President of Miramar and an attorney by trade, oversees operations, including accounts payable, and signs all checks issued by Miramar. He held ultimate decision-making authority in selecting Guardsmark to provide security services and approved payment of invoices submitted by Guardsmark. (Tr. 159-160, 162.) The business relationship with Guardsmark was difficult early on as a result of the billing disputes and disagreements about services. Due to these incidents, Miramar refused to make any more payments until such disputes were resolved. (Tr. 176-177, 210.)

Several disputes arose with respect to Guardsmark's services. Guardsmark did not consistently provide backup documentation with the invoices that Miramar wanted, such as time

sheets or payroll logs.[5]  (Tr. 161, 162.)  Mr. Lopez was particularly concerned about the overtime charges Guardsmark billed, which he believed exposed Miramar to liability for violation of Puerto Rican labor laws.  (Tr. 163, 164.)  He sought to ensure that Miramar was billed for the correct individuals (security guard vs. supervisor) during their audit seasons.  (Tr. 164-65.)  Mr. Lopez also testified that Miramar found security guards sleeping on the job and no supervision of security guards on duty.  (Tr. 165.)  Miramar sent letters to Guardsmark in November of 2007 addressing these issues.[6]

Although Ms. Franceschi was personally involved with the Miramar account (Tr. 93), she was not aware that Miramar continually disputed overtime hours billed or the billing of supervisor hours.  (Tr. 112-113, 128.)  During Guardsmark's relationship with Miramar, Ms. Franceschi's primary contact was Mr. Hernandez in his capacity as director of security.  (Ex. 9; Tr. 93.)  She had regular meetings with Mr. Hernandez in which they discussed Guardsmark's security services, billing, and other incidents that occurred at the Miramar locations serviced, as well as Guardsmark's overall performance.  (Tr. 98.)  Additionally, Ms. Franceschi discussed past due invoices with Mr. Hernandez.  She also spoke to Irma Lozada, an employee at Miramar, about past due invoices.  (Tr. 99.)   After attempting to contact Ms. Lozada to no avail, Ms. Franceschi on one occasion made a personal visit to Miramar's offices where she was denied a meeting.  (Tr. 100.)  Later, she met with Ms. Lozada, who gave her some payments.  (Tr. 101.)

---

[5] Ms. Francheschi confirmed this dispute between the parties, acknowledging that early in the business relationship there were problems coordinating the delivery of the daily logs documenting Guardsmark's work to Miramar.  (Tr. 125-126.)

[6] The content of the letters (written in Spanish) as elicited at trial is as follows: Exhibit 7, addressed to Mr. Cuyar at Guardsmark, alleged that two guards were found asleep at two different locations (Tr. 168); Exhibit 8 alleged that a guard at one of Miramar's properties was not following procedure (Tr. 168-169); Exhibit 9 also alleged that a guard was sleeping on duty at a Miramar property (Tr. 166, 251).  Miramar faxed a letter to Guardsmark regarding an incident which occurred on the last weekend of September 2007, in which construction materials were stolen from a building site while Guardsmark security guards were on duty. (Ex. 6, Tr. 170-171.)

Ms. Francheschi also attended a meeting with her regarding the Miramar's late payments. In attendance were Ms. Lozada, Mr. Hernandez, and Vince Sullivan, a regional manager for Guardsmark. (Tr. 142.) Ms. Franceschi stated that Mr. Hernandez and Ms. Lozada never told her that they believed Guardsmark was billing for services that were never rendered. (Tr. 101.) However, she was aware that Miramar had requested that invoices be changed so hours could be moved to another invoice for a special account. (Tr. 109-110.)

Ms. Franceschi further explained how Guardsmark billed Miramar for security services. Guardsmark security officers would write a daily report, fill out a timecard listing the hours worked, and sign the card. (Tr. 103.) A supervisor would collect the timecards at the end of the week and transfer the information to an outline. (Tr. 103-104.) The outlines and timecards were reviewed by the branch administrator, branch manager, and an account manager. (Tr. 104.) During this review, hours could be removed or reclassified if warranted. (Tr. 104-106.) The outlines were sent to the corporate office, which created invoices based on the information in the outlines. The invoices were sent to the client directly through the mail. (Tr. 107.) Through a memo, Ms. Franceschi was aware of complaints about security guards sleeping while on duty in November of 2008, but she felt there was insufficient evidence to verify the allegation. Upon further discussion with Miramar, the officer's hours were removed from billing. (Ex. 6; Tr. 111.) Alfredo Cuyar, Ms. Franceschi's associate and a manager at Guardsmark, also handled customer complaints, some of which Ms. Franceschi concedes she may not have been aware of. (Tr. 114-115, 120, 124, 133.) Ms. Franceschi conceded that Pablo Latorre, a manager covering the Miramar account at the time, also may have dealt with the complaints. (Tr. 125.) However, Ms. Franceschi participated in meetings with Mr. Hernandez where such complaints would

appropriately have been raised. (Tr. 134.) She stated that invoices were amended by Mr. Cuyar, but she was unaware of the reasons. (Tr. 136.)

Mr. Lopez initially testified that Miramar did not receive any credit or billing adjustments on the invoices they contested. (Tr. 171.) He stated that some of the disputed invoices they still had discrepancies once returned by Guardsmark, particularly overtime and holiday billing, and contends that the overtime or holiday hours should have been removed completely (Tr. 171, 174-175.) In sum, Miramar alleges that the discrepancies total over $94,000 in overbilling. (Tr. 175, 196-198.). The corrected invoices showed that Guardsmark did in fact remove overtime hours, but changed the billing rate to the regular security rate, thus the difference between the cost of regular hours and overtime hours with respect to the hours disputed by Miramar would not total $94,000. (Ex. 25; Tr. 256-257.) Mr. Lopez later admitted that Miramar may have received credit for some of the invoices they contested, and several of the invoices Miramar produced in discovery had been corrected,[7] (Ex. 16, Tr. 210-218) and that the corrected invoices Miramar produced where only an example of the instances in which there were disputes (Tr. 259).[8]

As a result of the parties' indefinite relationship, many terms of service were not thoroughly discussed, which lead to many of the disputes. There was a difference of opinion as to the role of a supervisor (Tr. 260), and the parties disputed the process by which overtime was billed. Based on the testimony of the parties, it appears that employees of Guardsmark considered the disputes as issues that could be handled on a case by case basis, and not a reflection on the quality their services. The Court finds that the evidence of resolved invoice

---

[7] In discovery, Miramar presented invoices that it claimed were disputed, but in fact were resolved prior to litigation. (Ex. 17-23; Tr. 226-28, 230, 237, 240, 242-43, 247.)

[8] Plaintiff objected to the entry of Exhibit #24 into the record, arguing that the invoice is not a part of the interrogatory responses. (Tr. 266-67.) As Plaintiff also used this exhibit during trial, the Court overrules this objection.

9

disputes shows that Guardsmark took adequate steps to resolve the billing issues and to service Guardsmark locations. Miramar, disgruntled over the continuing disputes, discontinued payment.

## II. Conclusions of Law

### a. Jurisdiction

Miramar has maintained that the Court lacks personal jurisdiction over the parties and renewed its motion to dismiss for lack of personal jurisdiction at trial. (Tr. 6, 153.) The Court previously found that Miramar had sufficient notice of the terms and conditions on the invoices they received during their course of dealing with Guardsmark such that it had submitted to personal jurisdiction in Tennessee. Having heard all the evidence in this case, the Court adheres to its previous rulings and finds that the Court has proper jurisdiction over the parties in this matter. (See Order Denying Def.'s Mot to Dismiss; see also Order Denying Def.'s Mot. to Stay and Granting in Part and Denying in Part Pl.'s Mot. for Summ. J. at 7-8.)

### b. Damages

The Court previously ruled that there was mutual assent to the terms and conditions contained on the invoices based on the course of dealings between the parties. The Court granted summary judgment on the issue of liability in favor of Guardsmark for Miramar's unpaid services. (Order Denying Def.'s Mot. to Stay and Granting in Part and Denying in Part Pl.'s Mot. for Summ. J. at 14.) Because Guardsmark provided Miramar services in conformity with its contractual obligations, Miramar is liable for damages as discussed below.

#### i. Unpaid Invoices

Mr. Lopez, President of Miramar, admitted that Miramar owes Guardsmark between one hundred and one hundred fifty thousand dollars, and Miramar disputes the amount in excess of

$150,000 due to discrepancies in billing and invoices that Miramar allegedly never received until the instant litigation. (Tr. 195.) At trial, Guardsmark presented unrebutted proof as to its claim. Miramar failed to prove that an offset was warranted. Miramar placed into the record invoices into the record that were already resolved, instead of providing an accurate record of remaining disputed invoices that would warrant an offset. Accordingly, Court finds that by a preponderance of the evidence, Guardsmark proved its claim of breach of contract, and proved damages against Miramar in the amount of $377,654.63.

### ii. Late Fee and Prejudgment Interest

The terms and conditions on the backs of Guardsmark's invoices state that late payments are subject to a late charge of 2% per month or such lesser amount as maybe allowed under applicable law. (E.g., Pl.'s Compl., Ex. D; Luse Aff. ¶ 10, Trial Ex. 3.) If the Court were to enforce the contract provision and award Guardsmark late fees at 2% per month with compounded interest, the amount of late fees would total over $160,350.19.[9] (Tr. 14.) Because Miramar made some efforts to resolve legitimate problems, and had a good faith basis for some of its actions, the Court will not enforce the 2% late fee provision.

Plaintiff requests prejudgment interest as an alternative to late fees. (Tr. 290.) Tennessee law provides that prejudgment interest "may be awarded . . . in accordance with the principles of equity" at a rate of not more than 10% per annum. Tenn. Code Ann. § 47-14-123. An award of prejudgment interest is within the sound discretion of the court. Spence v. A-1 Crane Services, Inc., 880 S.W.2d 938, 944 (Tenn. 1994). The court must decide whether the award is fair, given the particular circumstances of the case. Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998). Pre-judgment interest is intended to compensate parties that have been damaged "because

---

[9] This amount of late fees accrued at time of trial.

11

they have been deprived of the use of that money from the time they should have received it until the date of judgment." Scholz v. S.B. Int'l, Inc., 40 S.W.3d 78, 82 (Tenn Ct. App. 2000).  A grant of prejudgment interest is not always appropriate, such as 1) when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight; 2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed; or 3) when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money.  Id. at 83.  Prejudgment interest is not designed to "penalize a defendant for wrongdoing," Myint, 970 S.W.2d at 927.

The Court finds that the late fees claimed by Plaintiff would exceed the maximum rate of 10% interest on commercial transactions allowed by Tennessee law.  Tenn. Code Ann. § 47-14-103(3).  The amount of late fees requested by the Plaintiff is 42% of the amount requested for the unpaid invoices.  Thus the Court denies Plaintiff's request for late fees.  Exercising its equitable powers, however, the Court finds that prejudgment interest is fair and equitable in this case to compensate Guardsmark for the loss of its use of funds during the dispute, see generally In re Estate of Ladd 247 S.W.3d 628, 645-647 (Tenn. Ct. App. 2007).  Tennessee Code Annotated § 47-14-123 provides that 10% is the maximum a court may award, but it does not require prejudgment interest in that amount.  Based on the evidence presented in the case, the Court finds that an award of the maximum rate of 10% is unwarranted and would be unfair to Miramar.  The Court awards Plaintiff prejudgment interest at a rate of 5% per annum in the amount of $35,480.65.[10]

---

[10] The Court calculates the of prejudgment interest amount from the date Plaintiff filed suit: April 1, 2008.

### iii. Attorneys' Fees

Tennessee, like the vast majority of jurisdictions, adheres to the American rule for awarding of attorneys' fees. John Kohl & Co. v. Dearborn & Ewing, 977 S.W.2d 528, 534 (Tenn. 1998). Under the American rule, a party in a civil action may recover attorney fees only if: 1) a contractual or statutory provision creates a right to recover attorney fees; or 2) some other recognized exception to the American rule applies allowing for recovery of such fees in a particular case. Tayor v. Fezell, 158 S.W.3d 352, 359 (Tenn. 2005).

Under Tennessee law, it is the attorney who bears the burden of proving what constitutes a reasonable fee. See, e.g., Wright v. Wright, No. M2007-00378-COA-R3-CV, 2007 WL 4340871, at *5-6 (Tenn. Ct. App. Dec. 12, 2007) (citing Wilson Mgmt. Co. v. Star Distribs. Co., 745 S.W.2d 870, 873 (Tenn. 1988) and Hosier v. Crye-Leike Commercial, Inc., No. M2000-01182-COA-R3-CV, 2001 WL 799740, at *6 (Tenn. Ct. App. July 17, 2001)). Furthermore, "[c]ourts and commentators have observed that time records—time spent on the case—are 'central' to the calculation of attorney's fees." Id. at 6 n.6 (citing several authorities).

In this case, as stated above, the terms and conditions on Guardsmark's invoices contained a provision reserving the right to collect attorneys' fees and costs incurred to collect unpaid amounts. As Miramar consented to Guardsmark's terms and conditions through its course of dealing, Guardsmark's request for attorney fees is **GRANTED**. Plaintiff shall submit within fifteen (15) days of the date of this order a motion for attorney fees supported by proper documentation. Miramar shall have fifteen (15) days following the filing of Guardsmark's motion to respond. The Court will then determine the amount of fees to be awarded.

### III. Conclusion

Based on the foregoing, the Court enters judgment for Plaintiff, Guardsmark (Puerto Rico) LLC, in the amount of $377,654.63 contractual damages, plus $35,480.65 prejudgment interest, for a total award of $413,135.28. Post judgment interest is mandatory, and will be calculated at a rate pursuant to 28 U.S.C. § 1961. The Court will award attorneys' fees by separate order. Judgment will enter accordingly.

**IT IS SO ORDERED** this 17th day of February, 2010.

>  s/Bernice Bouie Donald
>  **BERNICE BOUIE DONALD**
>  **UNITED STATES DISTRICT JUDGE**